```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10-5-12
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
ADREINA ADAMS,

                      Plaintiff,                      09 Civ. 1329 (PKC)

            -against-                      MEMORANDUM
                                    AND ORDER

ANTHONY ELLIS, EXECUTIVE DIRECTOR
OF NYS DIVISION OF PAROLE; JOSE
BURGOS, DIRECTOR OF HUMAN
RESOURCE MANAGEMENT; MILTON
BROWN, REGIONAL DIRECTOR;
WILLIAM HOGAN, AREA SUPERVISOR;
IRWIN DAVIES, ASSISTANT REGIONAL
DIRECTOR; and ROBERT OESER,
EMPLOYEE RELATIONS OFFICER,

                      Defendants.
-----------------------------------------------------------x

P. KEVIN CASTEL, District Judge:

        Plaintiff Adreina Adams, who has been represented by counsel throughout this proceeding, brought this action pursuant to 42 U.S.C. § 1983 alleging that the defendants, managerial officers of the New York State Division of Parole ("DOP"), retaliated against her in response to her union activities, depriving her of certain rights guaranteed by the First, Fourth, and Fourteenth Amendments. On July 1, 2011, defendants moved for summary judgment on plaintiff's First Amendment retaliation claim. On March 2, 2012, the Court granted defendants' motion, expressing no opinion on plaintiff's Fourth and Fourteenth Amendment claims. Adams v. Ellis, 2012 WL 693568 (S.D.N.Y. Mar. 2, 2012). On April 23, 2012, defendants moved for summary judgment on plaintiff's remaining claims. For the reasons discussed below, defendants' motion is granted.

**BACKGROUND**

I.   Factual Background

The facts below are drawn from this court's first summary judgment opinion and references cited therein. See 2012 WL 693568. Defendant is a parole officer in the New York State Division of Parole ("DOP") and was at all relevant times assigned to the Manhattan 2 Bureau.[1] She is also an officer in the Public Employees Federation ("PEF"), the union that represents parole officers. Defendants were, at all relevant times, supervisory officers in the DOP: Jose Burgos was the Director of Human Resources Management for DOP; Milton Brown was the Regional Director for Region 1 of DOP, comprising Manhattan and the Bronx; Irwin Davies was Deputy Regional Director for Metro 1, located in Manhattan; and William Hogan was Area Supervisor for the Manhattan 2 Bureau.

Plaintiff publicly criticized certain DOP policy changes affecting parole officer duties and work requirements. She spoke at a PEF rally on July 8, 2005 (the "2005 rally") and gave testimony at a State Assembly hearing on DOP policies on January 11, 2006 (the "2006 hearing"). Defendants uniformly denied having any knowledge of plaintiff having participated in or spoken at the 2005 rally or at the 2006 hearing, with the exception of Hogan, who recalled Adams attending the 2005 rally but had no knowledge of her level of participation.

Plaintiff alleged that, sometime after the 2006 hearing, defendants took several adverse actions against her. She alleged that the Office of Professional Responsibility ("OPR") briefly audited her paperwork and, allegedly, the paperwork of all other attendees at the 2006 hearing, although there were no consequences to the alleged audits. Defendants uniformly testified that they had no control over or awareness of OPR audits. Plaintiff also alleged that one

---

[1] DOP merged with the New York State Department of Correction Services ("DOCS") in 2011 to form the New York State Department of Corrections and Community Supervision ("DOCCS"). Because the relevant conduct in this action occurred prior to the merger, the Court refers throughout to DOP.

of her paychecks was "held up" along with those of other attendees. Plaintiff was unaware whether everyone in her bureau received paychecks late. Defendants uniformly testified that they had no control over the issuance of paychecks. Plaintiff also alleged that defendants ordered her Supervisory Parole Officer, Christopher Wrobleski, to "monitor [plaintiff's] paperwork." Plaintiff also alleged that a vacation request she made was "denied against office policy and procedures," and that since October 2006, Wrobleski has kept a list of all officers taking time off for union activities.

On October 25, 2006, plaintiff was involved in an altercation with a fellow parole officer and Local 236 Shop Steward, Milagio Plumey, which led to plaintiff's discipline and transfer. Although plaintiff described it as a "verbal altercation," Plumey alleged that plaintiff pulled a chair out from under her when she attempted to sit in it. Hogan, who had witnessed the altercation, corroborated Plumey's account. Other witnesses stated either that they saw Adams pull out the chair, that they heard a noise and saw Plumey falling, or that they saw nothing. Plaintiff never appeared at an interrogation as part of the official investigation into the altercation, due to her inability to secure counsel for the first scheduled interrogation and her alleged sickness on both of the make-up dates. Burgos executed a Notice of Discipline ("NOD") suspending plaintiff for nine months and reassigning her to the Brooklyn 5 Regional Office, concluding that plaintiff had pulled the chair from under Plumey and that it would be inappropriate for plaintiff and Plumey to continue working in the same office.

Plantiff filed a grievance over the NOD. Plaintiff's representative during the grievance process, Manuela Clemente, stated that DOP officials were uncooperative during the process, because they told witnesses they did not have to give statements to plaintiff, did not offer their witness statements for her review, and did not provide her a "copy" or "tape" from the

grievance hearing. Clemente testified that these actions were contrary to the requirements of the Collective Bargaining Agreement ("CBA"). Review of the CBA indicates that the actions of the DOP officials were not inconsistent with the requirements of the CBA. The grievance process did not result in a consensual resolution, and plaintiff elected to go to arbitration. On March 17, 2007, the arbitrator issued an Opinion and Award finding that there was "just cause" for the NOD and finding "no evidence that DOP in any way instigated this action because of its displeasure with the local union leadership." The arbitrator found that Adams had created "reasonable doubt" as to whether she could be counted on to put aside any animus towards Plumey in the future. Therefore, the arbitrator upheld the permanent reassignment; however, he reduced the suspension from nine months to one week.

Plaintiff asserted that her penalty was "unprecedented," based on Clemente's testimony to the same effect. Clemente gave this testimony notwithstanding her knowledge of another officer who had been transferred to Buffalo. Clemente distinguished the Buffalo transfer because, she testified, the Buffalo transferee was transferred to be "re-trained" to "embezzle" for Director Ellis. Clemente also testified that officers guilty of more serious misconduct had received preferential treatment, citing as proof that an officer who had accidentally discharged her gun several times was given a "fantastic" administrative job. On the typicality of the penalty, Davies testified, and plaintiff agreed, that in Davies's three years as Deputy Regional Directory there were three NODs issued: one for Ms. Adams, one for a senior parole officer "who made some extremely inappropriate remarks to someone he supervised," and one for a parole officer arrested for possession of cocaine. Davies testified that the officer who made inappropriate remarks was suspended for one or two weeks and reassigned.

As regards her particular reassignment, plaintiff asserted that "Brooklyn 5 is a punishment bureau because it contains the biggest and most violent police precincts." She further asserted that, at Brooklyn 5, she was given an increased caseload, that the office location created a travel hardship, and that her fellow parole officers shunned her. Defendants asserted that plaintiff's transfer involved no change to her compensation, duties and responsibilities, or conditions of employment.

In June 2007, plaintiff wrote to defendant Brown and requested a "hardship transfer" back to Manhattan. In her request, plaintiff asserted that the increased travel time aggravated a back injury and that her new colleagues were shunning her, for which she blamed "the agency" for having sent an email to her colleagues containing a part of the arbitrator's decision.[2] Brown discussed the situation with Burgos and responded to plaintiff that they had decided to uphold the decision of a permanent transfer, and he directed her to address her concerns about her co-workers to her new chain of command.

II.   Plaintiff's Claims

Based on the foregoing, plaintiff brought three claims. The first, pursuant to 42 U.S.C. § 1983, asserted that defendants violated her rights under the Equal Protection Clause of the Fourteenth Amendment by being "deliberately indifferent to the hostile work environment and harassment of plaintiff and other Union activists created by the defendants and other parole officers under their supervision . . . because of their Union activities and outspokenness." (Compl. ¶ 69.) The second, also pursuant to 42 U.S.C. § 1983, asserted that, as a result of the defendants' actions, plaintiff "ha[d] been unlawfully subjected to a hostile working environment

---

[2] Here, plaintiff appeared to refer not to an email but to an edition of a DOP publication called "Human Resource Notes" or "HRN." HRN is a publication predating the tenure of Burgos, and it regularly included a section entitled "Labor Relations." The Labor Relations section of the edition in question referred to plaintiff's arbitration but did not identify plaintiff or any specific, recognizable details. Following the publication of the edition in question, PEF and plaintiff requested that Burgos stop including the Labor Relations section, and Burgos complied.

- 5 -

and harassment in retaliation for exercising her First, Fourth and Fourteenth Amendment rights to protected speech." (Compl. ¶ 71.) The third, grounded in no federal law, asserted a freestanding "hostile work environment" claim. (Compl. ¶ 76.)

### III.    The First Summary Judgment Opinion

Defendants moved for summary judgment but addressed only plaintiff's First Amendment retaliation claim. In response to that motion, plaintiff did not come forward with evidence or argument that she had been retaliated against on the basis of exercising her First Amendment right to associate with the union. The Court granted summary judgment on plaintiff's First Amendment retaliation claim. Familiarity with the Court's Memorandum and Order of March 2, 2012 is assumed.

### IV.    The Current Motion and Opposition

Following the Court's first summary judgment opinion, defendants filed a supplemental motion for summary judgment on plaintiff's remaining claims, relying on the same Rule 56.1 Statement, declarations, and exhibits. Plaintiff responded with opposition papers and an updated Rule 56.1 Statement, Rule 56.1 Counterstatement, declaration, and new exhibits. Plaintiff's new material falls into the following categories:

- Relationship of Plaintiff's Treatment to Union Activity:
    - assertion that plaintiff, in addition to speaking on matters of public concern, was also a "vocal Union activist" and was retaliated against on this basis as well. (Compare e.g., Adams Revised Decl. ¶¶ 6-10, and Pl. Revised 56.1 Counterstatement ¶¶ 56-59, with Adams Decl. ¶¶ 6-10, and Pl. 56.1 Counterstatement ¶¶ 53, 55);
    - assertion that Burgos told Wrobleski that plaintiff's entire "active union bureau" was being scrutinized, citing to a transcript page not included in plaintiff's submissions (Pl. Revised 56.1 Counterstatement ¶ 25);

- o assertion that the OPR audit was directed at the entire Manhattan 2 Bureau because it was a "strong union shop," citing to Wrobleski's testimony that he "assume[d]" the entire bureau was in PEF. (Pl. Revised 56.1 Counterstatement ¶ 77; Cronin Decl. Ex. C. at 100-101);

- o assertion that non-defendant Ellis, one-time Executive Director of BOP, enforced strict scheduling only against union activists, based on testimony of Clemente at 2006 hearing, in which she stated that Ellis had introduced stricter scheduling but made no reference to selective enforcement (Pl. Revised 56.1 Counterstatement ¶ 85; Cronin Decl. Ex. S. at 73-76);

- o assertion that "[t]here is no doubt that Management was aware of the Union's active role in fighting them . . . .  Because the Union Board called for the resignation of [Ellis], the union activists including plaintiff were vocal in complaining that DOP was responding by a campaign of harassment . . . ." (Pl Revised 56.1 Counterstatement ¶ 92.)

- Conflicting Testimony on Chair Incident: plaintiff's assertion that she did not pull out the chair and citation to witness statements in which certain witnesses could not affirmatively state that plaintiff pulled out the chair (Pl. Revised 56.1 Counterstatement ¶¶ 35, 95-96; Adams Revised Decl. ¶¶ 32, 43);

- Plaintiff's Illness: plaintiff's assertions that she was in fact sick and visiting doctors on the dates of the make-up interrogations that she missed, and that, pursuant to the CBA, she should not have been required to substantiate her absence with a doctor's note unless she had been absent three days. (Pl. Revised 56.1 Counterstatement ¶¶ 14-20; Adams Revised Decl. ¶¶ 67-73);

- Availability of Witnesses: plaintiff's assertion that witnesses to the chair incident told her that they were told not to give statements to her; Clemente's assertion to the same effect; Hogan's testimony that Davies told him plaintiff was not "entitled" to speak to witnesses (Adams Revised Decl. ¶ 36; Pl. Revised 56.1 Counterstatement ¶ 98 & Cronin Decl. Ex. W. at 185); citation to a PEF flier that allegedly establishes that "pursuant to the [CBA], parole officers must give statements to litigant or face disciplinary charges," but which states that parole officers must cooperate with inquiries from OPR, not "litigant[s]"  (Pl. Revised 56.1 Counterstatement ¶ 32 & Cronin Decl. Ex. M);

- Difficult Conditions at Brooklyn 5 (Pl Revised 56.1 Counterstatement ¶¶ 74-76; 86, 88, 99-100; Adams Revised Decl. ¶¶ 54, 56, 58);

- Permanent Transfer: assertions of plaintiff and Clemente that neither is aware of any other parole officer who has ever been disciplined with a permanent transfer (Pl. Revised 56.1 Counterstatement ¶¶ 83, 90; Adams Revised Decl. ¶

- 7 -

61; Clemente Decl. ¶¶ 2-4.)

## DISCUSSION

I. The Court Enters Summary Judgment Against Plaintiff on Plaintiff's Equal Protection Claim.[3]

Plaintiff's first claim is for defendants' alleged creation of or indifference to the "hostile work environment and harassment of plaintiff and other Union activists . . . because of their Union activities and outspokenness in violation of the Equal Protection Clause of the Fourteenth Amendment." (Compl. ¶ 69.) Plaintiff offers no support for the proposition that "harassment" or hostile work environment claims based on a government employee's union membership or protected speech are cognizable under the Equal Protection Clause. Such a claim appears indistinguishable from a claim that plaintiff was retaliated against for exercising her free speech and associational rights in violation of the First Amendment. A robust body of case law establishes, and limits, a government employee's right to recover for retaliation for exercise of First Amendment Rights. E.g. Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968); Connick v. Myers, 461 U.S. 138 (1983).

The Court finds no support for the proposition that a failed First Amendment retaliation claim is cognizable under the Equal Protection Clause merely because the employee received treatment that was disparate from other employees premised upon her speech activities. Under similar circumstances, the Second Circuit recognized plaintiffs' Equal Protection claim but held that it was indistinct from plaintiffs' First Amendment retaliation claim and failed for the same reasons. Cobb v. Pozzi, 363 F.3d 89, 110 (2d Cir. 2004). Specifically, in Cobb, the court addressed plaintiffs' claims that their employer, a corrections department, had retaliated

---

[3] The standards governing a motion for summary judgment are set forth in the Court's Memorandum and Order of March 2, 2012 and need not be repeated. See 2012 WL 693568 at *6.

- 8 -

against them for their union association by attempting to discipline them, but not other corrections officers, when they refused overtime.  Id. at 94-99.  Plaintiffs alleged that the employer's conduct was both retaliation for exercise of First Amendment rights and "selective prosecution" in violation of the Equal Protection Clause.  Id. at 99.  The Second Circuit recognized both claims but held that plaintiffs' selective prosecution claim "'coalesce[d]'" with the plaintiffs' First Amendment retaliation claim, and failed for the same reasons.  Id. at 110.  (quoting African Trade & Info Ctr. v. Abromaitis, 294 F.3d 355, 363 (2d Cir. 2002)).[4]

       Reading Cobb, this Court assumes without deciding that a government employee can bring a "harassment" or hostile work environment claim based on First Amendment activity under the Equal Protection Clause.  But the Court also concludes that, as in Cobb, plaintiff's First Amendment and Equal Protection claims have "coalesce[d]."  Cobb, 363 F.3d at 110 (quotations omitted).  However, the fact that the claims coalesce does not necessarily require entry of judgment against plaintiff on her equal protection claim in this case.  Defendants initially moved for summary judgment solely on plaintiff's First Amendment claim and only now move for summary judgment on plaintiff's Equal Protection claim.  In the interim, plaintiffs have revised their opposition papers, and their Equal Protection claim, although indistinct, has distinct support.  Accordingly, the Court is called upon to answer a question it has once resolved, whether defendants took adverse action in retaliation for plaintiff's First Amendment activity, but on the basis of new evidence and argument.

---

[4] In both Cobb, 363 F.3d at 110, and African Trade, 294 F.3d at 363, the Second Circuit went on to discuss a distinct Equal Protection claim, known as a "class-of-one" claim, in which plaintiffs allege not that they were discriminated against for established impermissible reasons but simply for no rational reason. The Supreme Court has since held that "the class-of-one theory of equal protection does not apply in the public employment context." Engquist v. Oregon Dept. of Agr., 553 U.S. 591, 598 (2008).

Defendants argue that, even assuming further review of plaintiff's claims is warranted, the law of the case doctrine counsels this Court to abide by the conclusions set forth in its first summary judgment opinion. "As most commonly defined, the [law of the case] doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." Arizona v. California, 460 U.S. 605, 618 (1983). However, rulings of a district court remain subject to revision "at any time before entry of final judgment," Rule 54(b), Fed R. Civ. P, and "[t]he major grounds justifying reconsideration are an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice," DiLauria v. Power Auth. of N.Y., 982 F.2d 73, 76 (2d Cir. 1992) (quotations and citations omitted). Plaintiffs do not argue that manifest injustice or a change in controlling law require reconsideration; rather, plaintiffs argue in effect that "new" facts dictate new conclusions based on the same controlling law. The Court disagrees.

In this case, the Court's first summary judgment opinion stated several conclusions which independently disposed of plaintiff's First Amendment retaliation claim. First, plaintiff failed to raise a genuine dispute whether her speech was speech on a matter of public concern. 2012 WL 693568 at *9-*11. Second, plaintiff failed to raise a genuine dispute whether any adverse actions that the defendants took were motivated by plaintiff's allegedly protected speech. Id. at *12-*17. In so holding, the Court held that plaintiff failed to raise a genuine dispute whether defendants had involvement in the OPR audit, the paycheck delay, the vacation denial, or conditions at Brooklyn 5 sufficient to create liability under Section 1983. Id. at *7-*8. Plaintiff also failed to raise a genuine dispute whether defendants had created the First Amendment equivalent of a hostile work environment—a "critical mass" adverse action. Id.

at*13-*14.  Instead, plaintiff raised a genuine dispute only as to whether her discipline and transfer were adverse actions, but plaintiff failed to raise a genuine dispute whether her allegedly protected speech was a motivating factor in defendants' decision to discipline and transfer her.  Id. at *14-*17.  Third, the Court held that even if plaintiff had engaged in protected speech, and even if it was a motivating factor in the discipline and transfer, plaintiff failed to raise a genuine dispute whether defendants would have taken the same actions regardless of that speech.  Id. at *17.

To succeed, plaintiff's new evidence would have to suffice to upset each of these three conclusions.  It does not.  Plaintiff directs much of her revised Rule 56.1 Counterstatement, declarations, and exhibits toward establishing that, in addition to exercising free speech rights, she exercised associational rights as a "vocal Union activist," and that union activists were harassed.  The Court assumes that plaintiff's union membership is sufficient to establish that she engaged in free association on a matter of public concern.  See Cobb, 363 F.3d at 110 (applying Connick standards to free association claim).  However, plaintiff's updated allegations of union-member harassment do not establish any new adverse actions.  First, plaintiff offers no new evidence that the defendants had sufficient involvement in the OPR audit, the paycheck delay, the vacation denial, or the conditions at Brooklyn 5 to give rise to liability under Section 1983.  These events, individually or collectively, do not amount to adverse employment action.  Second, plaintiff's other evidence of anti-union actions is either conclusory, (see Pl. Revised 56.2 Counterstatement ¶ 92 ("no doubt" that "Management" was aware of union opposition, and union activists were vocal in complaining of "campaign of harassment")), improperly supported, (see id. ¶ 85 & Cronin Decl. Ex. S. at 73-76 (attempting to establish unequal application of strict scheduling by reference to testimony detailing only strict scheduling, not unequal application)),

- 11 -

or relates to behavior that could not reasonably "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights," Washington, 373 F.3d at 320; (see Pl. Revised 56.1 Counterstatement ¶ 25 (referencing "scrutiny" of entire bureau)).  Third, plaintiff offers no new evidence sufficient to establish either "a pattern of near constant harassment," Phillips, 278 F.3d at 109, or a single "particularly severe" episode, Deters, 368 F.3d at 189, that could establish a critical mass claim.  Plaintiff also offers no new circumstantial evidence or evidence of temporal proximity between any specific union activity and her discipline and transfer that would allow the reasonable inference that those actions were motivated by plaintiff's union activity or association.  See 2012 WL 693568 at *14-*17 (discussing qualifying circumstantial evidence and requisite temporal proximity).  Finally, nothing in plaintiff's new submissions addresses the Court's conclusion that she failed to raise a genuine dispute whether defendants would have disciplined and transferred her regardless of any retaliatory motive.  See id. at *17.

> II.   The Court's First Summary Judgment Opinion Disposed of Plaintiff's Free-Speech Retaliation Claim.

Plaintiff's second cause of action is for defendants' "unlawfully subject[ing] [plaintiff] to a hostile working environment and harassment in retaliation for exercising her First, Fourth, and Fourteenth Amendment rights to protected speech."  (Compl. ¶ 71.)  The Court is aware of no authority for the proposition that the Fourth or Fourteenth Amendments confer rights to protected speech.[5]  As discussed above, the Court concluded in its first summary judgment opinion that plaintiff failed to raise a genuine issue of material fact as to whether she was

---

[5] The Court is speaking of rights directly conferred by the Fourteenth Amendment, as distinguished from First Amendment rights incorporated via the Fourteenth Amendment.  See 44 Liquormart v. Rhode Island, 517 U.S. 484, 489 n.1 (1996).

retaliated against for exercising her First Amendment right to free speech. Accordingly, the court's first summary judgment opinion disposed of plaintiff's second cause of action.

      III.    Plaintiff's Freestanding Hostile Environment Claim is not Cognizable under Section 1983.

Plaintiff's third cause of action is for creation of a "hostile working environment" in violation of no identified provision of the Constitution or federal law. As with her other claims, plaintiff asserts this claim pursuant to 42 U.S.C. § 1983. "Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." Albright v. Oliver, 510 U.S. 266, 271 (1994) (quotations omitted). A necessary "first step in any such claim is to identify the specific constitutional right allegedly infringed." Id. Plaintiff's third claim identifies no constitutional right—or right created by federal law—infringed by the creation of a hostile working environment. Therefore, it is not cognizable under Section 1983.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment on plaintiff's remaining claims (ECF No.53) is GRANTED. The Clerk is directed to enter judgment for the defendants.

                                        P. Kevin Castel  
                                  United States District Judge

Dated: New York, New York  
       October 4, 2012